NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1214

ADOPTION OF TONETTA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a Juvenile Court judge terminating his parental rights with respect to his daughter, Tonetta.[2]  On appeal, the father claims that the Department of Children and Families (DCF) failed to establish by clear and convincing evidence that he was an unfit parent, and that the judge erred in terminating his parental rights.  We affirm.

Discussion.  The father first argues that the findings in the aggregate were not supported by clear and convincing evidence and thus did not meet DCF's burden of proving the father's unfitness.  We disagree.

"When reviewing a decision to terminate parental rights, we must determine whether the trial judge has abused his discretion

---

[1] A pseudonym.
[2] The mother's parental rights were also terminated.  She is not a party to this appeal.

or committed a clear error of law." Adoption of Elena, 446 Mass. 24, 30 (2006). "When making this determination, subsidiary findings of fact must be supported by a preponderance of the evidence, with the ultimate determination of unfitness based upon clear and convincing evidence." Adoption of Rhona, 63 Mass. App. Ct. 117, 124 (2005) (Rhona II). See Adoption of Luc, 484 Mass. 139, 144 (2020). "Clear and convincing evidence is evidence that is 'strong, positive and free from doubt.'" Adoption of Lisette, 93 Mass. App. Ct. 284, 293 n.14 (2018), quoting Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 871 (1975). The evidence "must be sufficient to convey a high degree of probability that the proposition is true" (quotations and citations omitted). Adoption of Rhona, 57 Mass. App. Ct. 479, 488 (2003) (Rhona I), S.C., 63 Mass. App. Ct. 117 (2005). "Clear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." Custody of Eleanor, 414 Mass. 795, 800 (1993), quoting Stone, supra.

Here, the judge's findings are specific and detailed, "demonstrating that close attention has been given to the evidence." Adoption of Hugo, 428 Mass. 219, 224 (1998). The conclusions of law consider each of the fourteen factors set out in the relevant statute, G. L. c. 210, § 3 (c), and those

2

elaborated in case law.  These findings were supported by clear and convincing evidence introduced at trial, and they demonstrate that DCF met its burden of proving the father's unfitness and that the father's parental rights were properly terminated.

The judge's findings indicate that the child was born substance exposed in 2017, entered DCF custody shortly after her birth, was placed in a foster home, and later transferred to a second foster home.  The father became involved in the child's case in November of 2017, consistently visited with the child, and was adjudicated the child's parent in September of 2018.

The child was reunited with the father in March of 2019, but the care and protection case remained open due to his failure to formally obtain custody of the child through the Probate and Family Court.  After this reunification, numerous concerning events occurred at the father's residence:  (1) the father had been shot in May of 2018; (2) the father had been stabbed in March of 2019; (3) the father's girlfriend, who was the child's primary caretaker, was arrested in July of 2019 following an altercation with a neighbor that escalated to threats of violence and the father punching a window out, causing injuries to himself that required medical attention; (4) the police had conducted multiple "drug raids" at the father's apartment building, including a search of his apartment in April

3

of 2020 that led to the discovery of a small plastic baggie of crack cocaine in his waistband, wads of cash, and drug paraphernalia, and to the father being charged with possession of cocaine with intent to distribute; (5) incidents of domestic violence between the father and his girlfriend; and (6) an incident of domestic violence between the father and his girlfriend's son, who also lived with them.

In June of 2020, DCF removed the child from the father's care, citing safety concerns related to potential drug trafficking and domestic violence.  The child was place again in the second foster home, where she is cared for by two foster parents.  The judge found that the child has adjusted very well to this living situation, and it is in the best interests of the child to be adopted by the foster parents and continue to have visits with the father.

The father also claims that the judge gave improper weight to his criminal history.  We disagree.  Evidence of a criminal record, "to the extent that it had a bearing on [the father's] fitness as a parent, is germane in care and protection proceedings."  Care & Protection of Quinn, 54 Mass. App. Ct. 117, 125 (2002).  The father's criminal history is replete with charges of violence against persons, drug trafficking, and possession of weapons, which certainly bear on the father's

4

ability to provide a safe and secure home environment for the child.

Even though most of the charges brought against the father did not lead to convictions, there are numerous other facts indicating, as the judge found, that the father's unfitness is not merely temporary, but will continue undiminished into the foreseeable future. Over the course of DCF's attempts to permanently reunite the child with father, the father has refused to acknowledge the impact of his perpetration of physical, emotional, and mental abuse against his partners;[3] has refused to accept responsibility for the physical violence and crimes he has perpetrated; has failed to understand how his criminal activity and resulting "drug raids" put the child at risk; has not had a job or taken steps to ensure he has a stable income to provide for the child; has often been hostile to DCF workers; has refused or not productively utilized services DCF recommended to help ameliorate the conditions leading to the child's removal from his custody; and has refused to engage in a drug screen or substance abuse evaluation.[4]

---

[3] The record indicates numerous incidents of domestic violence the father perpetrated against women. For example, while the mother was five months pregnant with the child, the father was arrested after she reported that the father grabbed her by the neck and choked her until she lost consciousness because she used his ten-dollar bag of marijuana.

[4] The father claims in his brief that "the action plan tasks were just busywork DCF gives all parents regardless of whether they

5

Moreover, the judge was appropriately concerned with the father's inability to attend to the child's specialized medical needs. The father did not attend any of her medical appointments while she was living with him, does not fully understand her current needs and issues, and has not been able to address these in a prompt and consistent manner. "[T]he health and safety of the child must be the paramount concern," Care & Protection of Walt, 478 Mass. 212, 213-214 (2017), and we share the judge's concern that the child's health and safety would be at risk were she to return to the father's care.

While the father has been consistent with visiting the child and has a positive personal relationship with her, the judge did not abuse his discretion or commit a clear error of law in determining that these facts do not outweigh the overwhelming amount of evidence indicating that the father is

---

need such tasks" and "have no bearing on his ability to parent" the child. We disagree. The challenged tasks were related to the safety concerns identified by DCF that led to the child's removal and to the impact of his actions on the child's well-being. Two of these tasks related to potential substance use issues, which the father denied having, yet he refused to undergo any drug screening or evaluations. However, the fact that he was arrested for having crack cocaine on his person while the child was present, in addition to other drug-related arrests and searches of his home, is enough to raise a concern of substance use. "[A] parent's substance use or misuse 'clearly is relevant to a parent's willingness, competence, and availability to provide care, though not necessarily dispositive of the issue.'" Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021), quoting Care & Protection of Frank, 409 Mass. 492, 494 (1991).

6

unfit.  Contrary to the father's belief, the judge did consider the father's positive interactions and emotional bond with the child, as these facts led to the judge concluding that it is nonetheless in the child's best interests to permit the father to have posttermination visitation every other month and postadoption visitation four times per year with the child.

<u>Decree affirmed</u>.

By the Court (Vuono, Meade &
  Walsh, JJ.[5]),

*Joseph F. Stanton*

Clerk

Entered:  October 30, 2023.

---

[5] The panelists are listed in order of seniority.