NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-413

ADOPTION OF IVO (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After trial, a Juvenile Court judge found the mother and father of the three children currently unfit, terminated their parental rights, and approved the plans proposed by the Department of Children and Families (department) for the children's adoption.  See G. L. c. 210, § 3.  Each parent appeals, maintaining (1) the evidence was insufficient to prove that their parental unfitness was not temporary; and (2) the judge made several clearly erroneous findings.  The mother also contends that the judge abused his discretion by leaving posttermination and postadoption contact to the discretion of their legal custodian or adoptive parents.  We affirm.

---

[1] Adoption of Emily and Adoption of Laura.  The children's names are pseudonyms.

Background.  "We recount the relevant facts, reserving certain details for our discussion."  Adoption of Nancy, 443 Mass. 512, 513 (2005).  The mother and father are the parents of Ivo (born 2016), Emily (born 2018), and Laura (born 2021).  The family first became involved with the department in 2017 when a G. L. c. 119, § 51A, report (51A report) alleged that Ivo was exposed to domestic violence when the parents had a physical altercation that required police response and resulted in the father's being arrested and charged with assault and battery by means of a dangerous weapon.  The mother admitted Ivo was present during the altercation, but both parents denied that there were other incidents of domestic violence.  The department eventually closed this case.

The family again became involved with the department in October 2018, when another 51A report alleged parental neglect of Ivo because he was exhibiting inappropriate sexualized behavior, and the mother disclosed to the reporter that Ivo was exposed to sexual content in the home.  The 51A reporter raised concerns with the mother about Ivo trying to put his hand down another child's pants, and the mother said that the father watched pornography around Ivo all the time, and the father hit her in front of Ivo.  The parents later denied these allegations.

During a subsequent 51B investigation, the department became aware that the father had pending charges for enticing a child under the age of sixteen and lewd and gross conduct. The father admitted to the department that Ivo accidentally opened a pornography site while playing with the father's cell phone, and Ivo may have witnessed the parents having sex. Both parents denied having recent physical altercations, and the mother maintained that the father was not abusive. Due to the family's history of domestic violence, the father's open case for sexual misconduct, and the mental health diagnoses of both parents, the department opened the case for services.

The parents' second child, Emily, was born in December 2018. In February 2019 there was another incident of domestic violence in the home. The police were called, and the mother alleged that the father had grabbed her by the neck, and she had punched him in the eye. The department filed the underlying care and protection proceedings for Emily and Ivo. The department sought and was awarded temporary custody of both children in February 2019, and in January 2020 the department changed the permanency goal from reunification to adoption.

After Ivo and Emily were removed from the parents' custody, beginning in early 2019 and continuing until October 2021, the mother repeatedly represented to the department that she did not have a relationship with the father and was not in contact with

3

him.  The father admitted to department workers that he had interactions with the mother during this time but denied being in a relationship with her.  The judge did not credit the parents' denials.

The parents' third child, Laura, was born in December 2021. The mother had avoided contact with the department before Laura was born and acknowledged the father's paternity only when her pregnancy was evident in the month of Laura's birth.  The mother admitted at trial that she had lied about not being in a relationship with the father.  The department obtained custody of Laura shortly after her birth because of the past domestic violence between the parents and the removal of the two older children.  Laura's case was incorporated into the family's open case.

In July 2022, another 51A report was filed, alleging sexual exploitation of a seventeen year old female by the father.  The juvenile alleged that she was supposed to meet the father for a job interview, he coerced her into his home, smoked marijuana with her, then exposed himself to her.  The mother was present and speaking to the juvenile while the father exposed himself. The subsequent investigation found these allegations were supported.

In January 2023, the mother and father admitted that they were in a relationship and again living together.  Then, in

4

February 2023 the mother reported to a social worker that, although she and the father were living together, they were not in a romantic relationship and had no plans to be in one. The mother told the department that the father was moving to Chicago. In March 2023, the mother reported that the father had moved out of the home. The mother was unable to provide details about the father's trucking business in Chicago, and the department was unable to verify that the father had moved out. The judge found the mother's testimony about her current level of contact and relationship with the father not credible. The judge credited the social worker's testimony about previous home visits and found that the mother and father had a pattern of misleading the department and remaining in an unhealthy relationship without engaging in services to address their domestic violence.

The mother testified at trial that the father was physically and verbally abusive toward her. She testified that the physical abuse ended in 2019, but the father continued to be verbally abusive. The judge credited testimony from various social workers and found that the allegations of ongoing intimate partner violence between the mother and father were substantiated. The father did not attend the trial, and the judge drew a negative inference from his failure to appear.

5

Discussion. 1. Legal Standard. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). Clear and convincing evidence means that "[t]he requisite proof must be strong and positive; it must be 'full, clear and decisive.'" Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997). "We review the judge's findings with substantial deference, recognizing [his] discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. at 515, "and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.

2. Parental unfitness. "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). It is "appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parents' unfitness at the time of trial may be only temporary"

6

(citation omitted).  Care & Protection of Zeb, 489 Mass. 783, 788 (2022).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Adoption of Ilona, 459 Mass. at 60.

Here, the judge's "specific and detailed findings demonstrate[] that close attention has been given to the evidence."  Adoption of Quentin, 424 Mass. 882, 886 (1997).[2] Given the parents' years'-long effort to mislead the department about their ongoing intimate relationship, which involved intimate partner violence, combined with the parents' failure to acknowledge the effects of that violence on their children, and the parents' failure to demonstrate "significant improvement" in meeting the children's needs, "the judge did not clearly err in finding that [these parents were] unfit and that [their] unfitness was not temporary."  Adoption of Ilona, 459 Mass. at 62.

a.  Intimate partner violence.  "Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children."  Adoption of

_____

[2] The father also maintains that the judge improperly relied on his initial findings rather than the detailed subsidiary findings in terminating the father's parental rights.  This claim is unavailing; the father has not cited any supporting authority for it.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

7

Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). "It is well documented that witnessing domestic violence, as well as being one of its victims, has a profound impact on children." Custody of Vaughn, 422 Mass. 590, 599 (1996). A child who witnesses "such abuse suffers a distinctly grievous kind of harm." Id. at 595. "The evidence in this case supported the judge's reliance on domestic violence as a significant factor in deeming the [parents] unfit." Adoption of Jacob, 99 Mass. App. Ct. 258, 264 (2021).

The judge found that the father had a history of domestic violence with the mother which negatively affected Ivo and Emily. The judge found that the father inconsistently engaged with tasks on his action plan to address his abusive behaviors: he referred to a batterers assessment as "fucking dumb," he failed to participate in an anger management group, and he did not complete a sexual offender's evaluation. Although the father eventually participated in an intimate partner violence class and some individual therapy for his anger, the judge found he had not meaningfully benefited because he continued to have angry outbursts toward the department and the children after participating in these services. "[A] judge can consider a pattern of 'past conduct to predict future ability and performance.'" Adoption of Ulrich 94 Mass. App. Ct. 668, 676 (2019), quoting Custody of Michel, 28 Mass. App. Ct. 260, 269-

8

270 (1990). "[I]nstances of such familial violence are compelling evidence for a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017).

With respect to the mother, "[a] judge may properly consider a parent's decision to remain in a relationship with an abusive partner in determining parental fitness." Adoption of Jacob, 99 Mass. App. Ct. at 265. During the department's various investigations, the mother denied any continued violence in her relationship with the father. She testified that she learned in classes that domestic violence is detrimental to children, but she nonetheless resumed or continued her relationship with the father after she attended these classes. While the father was allowed only supervised visits with the children, the mother allowed him to visit with the children during her unsupervised visits and lied to the department about her ongoing relationship with him. The judge was not required to believe the mother's claim that she had separated herself from the father and from the cycle of domestic violence, see Adoption of Anton, 72 Mass. App. Ct. 667, 675 (2008), and reasonably concluded that the parents lied to hide their ongoing relationship.

The judge also found that the mother was present while the father exposed himself to a minor. "A parent's willingness to ignore or minimize abusive behavior can be an indicator of

9

unfitness, regardless of whether the child is at risk of abuse or witnessing abuse." Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018).

"The judge properly considered [the parents'] continued failure to address how domestic violence affected [their] parenting" when evaluating their parental fitness. Adoption of Yvonne, 99 Mass. App. Ct. 574, 579-580 (2021). "[T]he [parents'] consistent failure to address these issues supported the judge's conclusion that [their] unfitness would continue indefinitely." Adoption of Xarissa, 99 Mass. App. Ct. 610, 619 (2021).

b. Action plan participation. Both parents maintain that the judge failed to credit their engagement in the action plans set out by the department. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60.

The department created various action plans for both parents. The judge credited the father's participation in some programs and therapy, including his completing six weeks of an intimate partner violence program, but found that he otherwise avoided the department and court throughout much of the case.

10

The father inconsistently showed up for visits with the children, struggled to manage the children's behavior, and failed to follow department instructions at visits. The father also blamed Ivo's behavioral issues on the department. The judge further found that the father was hostile and aggressive toward department workers, foster parents, and the children on several occasions. See Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) (parent's lack of cooperation with DCF was "relevant to the determination of unfitness").

The judge credited the mother's engagement in her action plan, including her participation in individual counselling and parenting classes. But he found that her relationship with father "in part shape[d] her level of engagement with the [d]epartment." At visits, the mother struggled to control Ivo's behavior and to care for all the children at the same time. "[M]ere participation in the services [recommended by the department] does not render a parent fit 'without evidence of appreciable improvement in [their] ability to meet the needs of the child[ren].'" Adoption of Ulrich, 94 Mass. App. Ct. at 677, quoting Adoption of Terrence, 57 Mass. App. Ct. 832, 835-836 (2003).

The judge's conclusion that, despite the mother's attendance at classes on domestic violence and parenting, she did not disengage from a violent relationship with the father

11

was well grounded in the evidence.  The father's minimal engagement with his action plan similarly failed to result in appreciable improvement in his ability to meet the children's needs, as the judge appropriately found.

c.  Other evidence of unfitness.  The judge also considered other evidence relevant to unfitness including (1) both parents' criminal conduct, see Care & Protection of Frank, 409 Mass. 492, 495 (1991) (judge properly considered parent's criminal conduct as relevant to unfitness); (2) the parents' inability to recognize or manage Ivo and Emily's emotional needs and behavioral issues, see Adoption of Paula, 420 Mass. 716, 730 (1995) (participation in services "had not appreciably improved [the mother's] capacity to 'meet the complex emotional and physical needs of her children'"); and (3) the stability of the parents' employment and living arrangements, see Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 136 (1990) ("It is in the best interests of [the children] to have 'parents' who can and who will, on a consistent, long term basis, assume all parental responsibilities and who can provide [the children] with the stable and continuous care and nurturing [they] need[] and will continue to need").[3]  "[A]lthough the judge's findings on

_____

[3] Both parents maintained that certain findings were clearly erroneous, but most of these challenges "amount to no more than a disagreement with the judge's weighing of the evidence and

12

[certain] points may have been erroneous, the judge's over-all conclusion of parental unfitness is fully supported by the record." Adoption of Helen, 429 Mass. 856, 860 (1999).

A "judge is not required to grant [a parent] an indefinite opportunity for reform." Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012). See Adoption of Nancy, 443 Mass. at 517. Given the "fleeting" nature of childhood and the judge's findings, supported by the record, that the parents did not make substantial progress to acknowledge and address the domestic abuse in the years between losing custody of the older children and trial, we conclude that the judge paid careful attention to the evidence and therefore did not abuse his discretion. See Adoption of Ilona, 459 Mass. at 60.

3. Posttermination and postadoption visitation. The mother maintains it was error to leave future contact between the parents and children in the discretion of the legal custodian. "A trial judge's decision whether to order

---

credibility determinations regarding the witnesses." Adoption of Don, 435 Mass 158, 166 (2001). To the extent the judge erred by drawing a negative inference from mother's nonattendance at one day of trial -- a matter as to which the record is ambiguous and the judge's knowledge superior to ours -- or misidentified to whom the mother lied and for how long, these errors were "not central to the ultimate conclusion of unfitness" when the primary concerns were the parents' failure to address the ongoing intimate partner violence and their ongoing, deliberate deception of the department. Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003).

visitation between a child and a parent whose parental rights have been terminated is reviewed for an abuse of discretion." Adoption of Xarissa, 99 Mass. App. Ct. at 623-624. In determining whether such visitation is in a child's best interests, the judge must consider whether the child has a "significant, existing bond with the biological parent" and whether "the child has formed strong, nurturing bonds" with a preadoptive family. Adoption of Ilona, 459 Mass. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000). "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child[ren]'s best interest[s]." Adoption of Ilona, supra.

The judge's findings recognized the mother's continued relationship and contact with the children. The judge found that Ivo still experienced behavioral challenges in his foster care placement but was participating in trauma therapy while the department sought a placement that supported his needs. Emily and Laura have been out of the mother's care since they were infants, and there was testimony that the children are "adapting" to the preadoptive home and the children seemed "happy [and] comfortable."

"There is no reason to question the presumption that [the children's] preadoptive parents will act in [their] best interest[s]" in determining whether continued visitation with

14

the mother is in their best interests; "nor is there any compelling reason requiring that a visitation order be entered in order to protect the best interests of the child[ren]." Adoption of Ilona, 459 Mass. at 66. "Stability in the lives of children is important, particularly in a case that has continued for a long period of time in the hope that the [parents] could and would successfully rehabilitate [themselves]." Adoption of Nancy, 443 Mass. at 517. "The judge therefore did not abuse his discretion in leaving the issue of visitation to the sound judgment of the [legal custodians] who will be in the best position to gauge whether such visits continue to serve the [children's] best interest[s]." Adoption of Ilona, supra.

Decrees affirmed.

By the Court (Vuono, Singh & Hershfang, JJ.[4]),

Clerk

Entered: March 11, 2025.

---

[4] The panelists are listed in order of seniority.

15